# SLINGLUFF *v.* MAYNARD.

---

PATENTS; INTERFERENCE; SPECIFICATIONS AND CLAIMS.

In an interference case involving an improvement in the manufacture of glass cylinders from which plate glass is made, the invention in issue consisting of the use of a shifting device which shifted the bait and cylinder after the bait became disengaged from the blow pipe, and performed the function of disengaging the bait from the blow pipe, it was *held* upon an examination of the claims and drawings of one of the parties, that he had no right to make the claim of the issue, as they showed that the idea of providing means for the automatic disengagement of the joint had not entered his mind until after the other party had entered the field, and that accordingly the other party was entitled to an award of priority.

No. 661. Patent Appeals. Submitted November 10, 1910. Decided December 5, 1910.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference case.                    *Reversed.*

The facts are stated in the opinion.

*Mr. Paul Synnestvedt* and *Mr. James C. Bradley* for the appellants.

*Mr. C. F. Byrnes* and *Mr. George H. Parmelee* for the appellee.

Mr. Justice VAN ORSDEL delivered the opinion of the Court:

This is an appeal from the decision of the Commissioner of Patents, awarding priority of invention to appellee, Oliver E. Maynard, on the following issue:

"In combination in apparatus for drawing glass cylinders, a drawing frame provided with a blow pipe and means for elevating the blow pipe, a hollow bait, means whereby the bait and blow pipe may be detachably secured together in communication, and shifting means for the bait and cylinder, adapted to automatically disengage the blow pipe and bait."

No testimony was taken by either party. A motion was made by appellants, Harry G. Slingluff and Herman S. Heichert, to dissolve the interference, on the ground that appellee had no right to make the claim in issue. The motion was denied by the Primary Examiner, which decision was approved by the Examiner of Interferences, who awarded priority to appellee. On appeal, this decision was reversed by the Board of Examiners-in-Chief. The decision of the board was, in turn, reversed by the Commissioner of Patents, from whose decision this case comes here on appeal.

Appellee is the senior party, and the sole question presented is his right to make the claim in issue. The issue involved relates to the manufacture of glass cylinders from which plate glass is made. The structure, in so far as the present case is concerned, consists of a tube or bait enlarged at the lower end

intô the shape of an inverted funnel with a socket at the upper
end.  In this socket is inserted the end of what is termed the
blow pipe.  The air used in blowing the glass cylinders is
forced through the blow pipe and bait, when connected, by arti-
ficial means not necessary to be described.  On the upper end
of the bait the socket forms a collar or shoulder considerably
larger than the pipe.  This shoulder rests on forks attached
to a cage, which is used for raising the bait and blow pipe when
connected and in operation, and for lowering the bait and cylin-
der after disengaging the blow pipe.  It should be remembered
that the blow pipe maintains at all times a rigidly perpendicular
position, its only movement being up and down.  This move-
ment is directed by virtue of the blow pipe's being socketed
and moving in a larger pipe.

When ready for use, the inverted funnel end of the bait is
inserted in the molten glass; the cage supporting the bait, when
connected to the blow pipe, is slowly raised, and, by the in-
troduction of the proper volume of air, a glass cylinder is blown,
of large dimensions.  When the blowing process is completed,
the blow pipe is disengaged from the bait at the socket, and
the cylinder is disconnected at the lower end, and moved onto
a carriage.  Simultaneously with the movement of the carriage
at right angles to the perpendicular movement of the cage sup-
porting the bait at the socket end, the cylinder, with the bait
attached, is lowered until it assumes its position on the carriage,
when the hooks of the lowering cage supporting the bait disen-
gage themselves from the bait, leaving the cylinder and bait
lying on the carriage in a substantially horizontal position.
The bait is then cut from the cylinder and made ready for
use in blowing another, when it is again readjusted in the forks
of the cage, connected with the blow pipe, the inverted funnel
end of the bait inserted into the molten glass, and the process
above described repeated.

Appellant's invention described a means for automatically
raising the blow pipe and disengaging it from the socket end
of the bait, so that the action of the bait, in connection with the
attached cylinder, would be free and unimpeded by the rigidly

perpendicular blow pipe when being lowered into its position on the carriage. Appellee, being the first inventor, insists that the claim in issue can be read onto his structure, and that he should be permitted to adopt it as against the claim of appellants.

In order to understand more fully the standing of appellee, it is necessary to examine his claims as they appeared in the Patent Office when appellants came into the field. In appellee's original application appeared the following claims descriptive of his invention:

"3. A window-glass-making machine, comprising a movable block for supporting a glass pot, a frame located thereabove, said frame being provided with vertical guides, an elevator cage movably mounted on said guides, said cage having projections separated from each other by a space, a tube adapted to pass through said space, and having means for engaging said projections, whereby the tube is supported on the cage, said tube having a bait located at its lower end, and a second tube located above the first, and telescopically connected therewith for conducting air to said bait.

"4. A machine for making glass cylinders, comprising a vertically movable elevator cage having means for supporting a tube, a telescoping tube mounted on said cage and having a bait, an air cylinder connected with said tube, and means for forcing air from the cylinder into the tube when the cage is raised."

"8. A machine for making hollow glass articles, comprising a movable tube having a bait, a cylinder communicating with said tube, means for raising and lowering the tube, and means for forcing air from the cylinder through the tube when the tube is raised, and for drawing air into the cylinder from the outside when the tube is lowered."

"10. A machine for making hollow glass articles, comprising a movable bait, a tube connection therewith, means for forcing air through the tube, a conveyer adapted to move into a position adjacent to said bait, and means for simultaneously moving the tube to the conveyer."

"13. A machine for drawing hollow glass articles, comprising a movable bait, a tube connected with the bait, an inclined track, a carriage on said track, said carriage having means for supporting an article formed by the machine, and means for simultaneously moving the tube and said carriage.

"14. A machine for forming glass articles by drawing, comprising a frame, a movable bait supported by the frame, an inclined track located adjacent to the frame, a carriage mounted on said track, and an oscillatable frame mounted on the carriage, and having means for supporting the product of the machine."

"19. A glass making machine comprising an inclined track, a carriage mounted thereon, a series of flanged sheaves upon said carriage, a frame mounted on said sheaves and adapted to be moved along them, said frame being provided with projecting arms for supporting glass articles, a capping-off horse located adjacent to the lower end of said track, and means connected with said horse for removing a glass article from said carriage."

It also appears that on August 2, 1907, about three months before appellants came into the field, in response to a suggestion from the Patent Office, appellee amended his application by adding the following claims:

"29. In a take-down device for glass cylinders, an inclined track, a drawing device, a carriage movable on the track, and a connection between the carriage and the drawing device.

"30. In a take-down device for glass cylinders, a drawing device supporting a blow-pipe connection or bait, a taking-down device, and means for effecting the disconnection of the blow-pipe connection or bait from the drawing device during its downward movement."

We think it clearly appears from the foregoing claims that appellee provided for a detachable joint. The difficulty is to determine whether he had in mind a means whereby an automatic disengagement of the joint could be accomplished in lowering the cylinder and bait. The old method of disengaging was accomplished by hand. The object of appellants' inven-

tion was to provide a method of overcoming this inconvenience, and of mechanically performing the disengagement, so that it would automatically occur in conjunction with the lowering of the bait and cylinder. It will be observed that the invention in issue resides in the use of the shifting device which both shifts the bait and cylinder after the bait is disengaged from the blow pipe and performs the function of disengaging the bait from the blow pipe. There seems to be no doubt but that the shifting device is sufficiently set forth in the claims of appellee. It is, however, not so clear just how he contemplated accomplishing the disengagement of the joint. Counsel for appellee claims that this is accomplished by constructing the socket on the bait so shallow and so large that the blow pipe will fit loosely enough therein to pry out when the lower end of the cylinder is carried out of its perpendicular position by the shifting carriage, and the downward movement of the bait and cylinder toward a horizontal position is begun.

The objection to this theory is that it cannot be read onto appellee's drawing. The drawing shows a deep, close-fitting socket joint, which would not permit of the operation described. Holding appellee strictly to his drawing, the only apparent means of disengaging the joint is by lifting the blow pipe out of the socket simultaneously with the lowering of the bait and cylinder.

Counsel for appellee introduced at the argument a number of drawings and specifications of earlier patents showing the prior art. Among these is one known as the Lubbers patent, in which the blow pipe is raised simultaneously with the lowering of the cylinder and bait by means of a rope attached to the blow pipe, and passed through a pulley above, the end extending down to a point where it can be caught by the operator. The operator is thus enabled to disengage the blow pipe from the bait, and keep control of it until the lowering process is completed. It appears from the statement of counsel for appellants that appellee and Lubbers were colaborers in the works of the Window Glass Machine Company, the assignee of both patents. That appellee intended to use the Lubbers device for the dis-

engagement of the joint becomes apparent when we consider the object he was seeking to attain. An examination of his claims discloses that he was aiming at the discovery of an invention to dispose of the use of manual labor in lowering the bait and cylinder. As stated at the end of his specification: "The machine itself cuts down and takes down the cylinders, thus dispensing with hand operations to perform these steps." This is wherein appellee's invention constituted an improvement over the Lubbers patent.

We are forced to the conclusion that the idea of providing means for the automatic disengagement of the joint never entered the mind of appellee until after appellants came into the field. To answer that appellee, by the application of mere mechanical skill, could change the tight-fitting, deep joint into a loose-fitting shallow joint, or even a beveled joint, and by these methods, of very doubtful practicability, effect an automatic disengagement of the joint, in the absence of any apparent intention on his part to accomplish such an end, would be equivalent to holding that the claim in issue does not involve invention. The means for the automatic disengagement of the joint does, in our opinion, involve invention. Before, therefore, this invention can be read onto the specifications, claims, and drawings of appellee, we must indulge in a maze of questionable presumptions wholly unwarranted in the light of appellants' adequate disclosure.

We concur in the conclusion reached by the Board of Examiners-in-Chief. The decision of the Commissioner of Patents is therefore reversed, and the clerk is directed to certify these proceedings, as by law required.        *Reversed.*